United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALDERON,

        Plaintiff,

  v.

A.P. KANE,

        Defendant.

No. C05-05036 MJJ

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Pending before the Court is Petitioner Guy David Calderon's ("Petitioner" or "Calderon") Petition for a Writ of Habeas Corpus. (Docket No. 1, hereinafter "Petition.") Calderon, a represented California prisoner, challenges his 1983 state conviction under 28 U.S.C. § 2254. Calderon alleges the California Board of Parole Hearings[1] ("Board") violated his state and federal Due Process rights by denying parole a fourth time without any supporting evidence. Respondent A.P. Kane ("Respondent"), Warden of Soledad Correctional Facility, filed an Answer to Calderon's Petition. Calderon filed a Traverse.

For the following reasons, the Court **DENIES** Calderon's Petition.

///

///

---

[1] The Board of Parole Hearings was formerly known as the Board of Prison Terms and appears in Calderon's Petition as "BPT."

# FACTUAL BACKGROUND

**A.     Commitment Offense.**

On August 19, 1982, at approximately 6 a.m., a young male dressed as a police officer rang the doorbell of the Berg residence in Atherton, California. The victim, Mrs. Berg, answered the door. The male ("Subject #1") informed Mrs. Berg he was investigating a burglary in the neighborhood and asked to see her back yard. At that point, Subject #1 pulled a gun and forced Mrs. Berg into her house. Subject #1's companions, Subjects #2 and #3, including Calderon, appeared and forced their way into the house. For the next two to three hours, Mrs. Berg and her eight-year-old daughter were held at gunpoint as the Subjects went through the house looking for cash. When they were unable to locate any cash, the Subjects handcuffed Mrs. Berg and placed her and her daughter into the trunk of the Berg's car. The Subjects proceeded to drive Mrs. Berg's car around for an extended period of time with Mrs. Berg and her daughter in the trunk, making multiple stops. At one point, the Subjects forced Mrs. Berg to phone her husband to relay a ransom demand of Mr. Berg for two million dollars. At some point, Mrs. Berg's car became stuck in some mud in a remote location. The Subjects took Mrs. Berg from the trunk of her car and handcuffed her to the steering wheel, telling her not to attempt an escape. Mrs. Berg's daughter was left free to go. The Subjects told Mrs. Berg that if Mr. Berg paid the ransom, the Subjects would inform him of Mrs. Berg's location. The Subjects then fled the scene. Mrs. Berg, with the aid of her daughter, was subsequently able to free the car from the mud and escape.

On April 18, 1983, following a jury trial, Calderon was convicted of violating California Penal Code § 209, kidnapping for robbery in San Mateo Superior Court in San Mateo County, California and sentenced from 14 years to life pursuant.

**B.     July 26, 2004 Parole Proceedings**.

On July 26, 2004, Calderon made his fourth appearance before the Board, at which time the Board both denied parole and delayed his next parole hearing for two years. (Resp., Ex. 2.) Both Calderon and his attorney at that time were present at the hearing and given an opportunity to speak. (*Id.*) The Board considered the commitment offense, pre-commitment criminal and social history, post-conviction behavior and "overall programming," Calderon's progress since his last hearing,

2

psychiatric reports and other information bearing on his suitability. (*Id.*)

First, the Board considered Calderon's commitment offense. The Board found the offense was committed in an "especially cruel and callous manner" because "multiple victims were attacked and held hostage during the crime" (*id.* at 75:15-18) and the crime was done with "callous disregard for human suffering" (*id.* at 75:19-20). The Board supported this conclusion by citing the factual record of the crime. (*Id.* at 75:20-77:1.)

Second, the Board considered Calderon's "escalating pattern of criminal conduct" and "history of tumultuous relationships with others." (*Id.* at 77:1-4.) Noting Calderon's problems in grade school and prior criminal record, the Board concluded Calderon "has failed to profit from society's previous attempts to correct his criminality." (*Id.* at 77:5-7.)

Third, the Board found Calderon's post-commitment psychiatric reports contradictory and, in some cases, unreliable. The Board discounted the January 28, 2004 report by Staff Psychologist Awhewchuk as unreliable because it did not address Calderon's insight into the commitment offense and "doesn't really cover the things that the Panel needs." (*Id.* at 78:1-7.) While that report concludes that Calderon is suitable for release, the Board felt that the report did not support the conclusion. (*Id.* at 78:7-10.) The Board noted that the 2004 Correctional Counselor's report indicated Calderon would be a "high degree of risk." (*Id.* at 78:14-17.) The Board noted the 1999 report by Dr. Steven Terrini found Calderon to be high risk and his insight impossible to assess because, at that time, Calderon did not discuss his commitment offense. (*Id.* at 78:10-20.)

Having considered that information, the Board discussed its findings. The Board found that Calderon "needs to participate in self-help to discuss, understand, and cope with stress in a nondestructive manner." (*Id.* at 79:2-4.) Until he makes further progress, the Board found Calderon to remain "unpredictable and a threat to others." (*Id.* at 79:4-6.) Calderon was considered unpredictable and a threat because he had "11 115's and basically all of them are very serious. One was even an escape." (*Id.* at 79:9-12.) Although Calderon had made gains, the Board found these gains to be recent. The gains were considered recent, in part, because Calderon discussed his commitment offense for the first time with the Board. (*Id.* at 79:12-14.) Calderon "must demonstrate an ability to maintain these gains over an extended period of time." (*Id.* at 79:6-9.)

3

However, the Board did praise Calderon for his vocational training, involvement in self-help programs and books. (*Id.* at 79:15-24.) Nonetheless, the Board found the "positive aspects of his behavior and programming do not outweigh the factors of unsuitability and the commitment offense." (*Id.* at 79:24-80:1.)

Having denied Calderon parole, the Board also ruled to deny Calderon for two more years. (*Id.* at 80:1-4.) In making their decision, the Board reiterated the facts of the commitment offense and supported their conclusion by stating that Calderon needed "additional time in order to fully understand and deal with the causation factors that led to the commission of the life crime." (*Id.* at 80:23-25.) According to the Board, given Calderon's post-commitment disciplinary history, additional time is necessary to observe and evaluate Calderon to determine suitability for parole. (*Id.* at 80:25-81:7.) The Board recommended that Calderon remain disciplinary free, participate in any available self-help, and "cooperate with clinicians in the completion of a new clinical evaluation." (*Id.* at 81:7-12.)

**C.   Habeas Proceedings.**

The San Mateo County Superior Court denied Petitioner's original writ for habeas corpus in April 2005 in a reasoned decision. (Resp., Exh. 5.) His habeas petitions with the California Court of Appeal and the California Supreme Court were summarily denied. (Resp., Exhs 6 & 7.) Respondent concedes that Petitioner has exhausted the administrative and state court remedies regarding the federal due process claim. For the purposes of 28 U.S.C. § 2254(d), the last "reasoned [state court] decision" is the April 2005 Superior Court Order, in which the court denied the petition on the grounds that it "fail[ed] to reveal sufficient facts which, if true, would establish a prima facie case for relief." (Resp., Exh. 5.) *See LaJoie v. Thompson*, 217 F. 3d 663, 669 n.7 (9th Cir. 2000) (in determining whether the state court's decision is contrary to, or involved in an unreasonable application of, clearly established federal law, a federal court should look to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision).

Petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2254 on the grounds that the Board violated his federal due process rights when it found him unsuitable for parole in July 2004. This Court ordered Respondent to show cause why the petition should not be granted on the

4

1 basis of Petitioner's claim. Respondent filed an answer, accompanied with memorandum and
2 exhibits. Petitioner filed a traverse.

## LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgement of a State court only on the ground that he is in custody in violation of the Constitution or the laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to habeas review of a state court decision upholding a parole board's denial of parole. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006). Under AEDPA, this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Rice v. Collins*, 546 U.S. 333 (2006).

///

## ANALYSIS

**A.     California Inmates Have A Liberty Interest In Parole.**

The first issue before this Court is whether the Court has jurisdiction to consider Calderon's Petition. Calderon's Petition was brought under 28 U.S.C. § 2254, which permits a federal district court to consider a petitioner's habeas petition if it raises a federal question. Respondent argues this Court lacks jurisdiction because Calderon does not have a state-created liberty interest in parole, and Calderon's due process claims therefore do not implicate a federal constitutional interest.

While there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979), a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutionally protected liberty interest. *See Bd. of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987) (holding that Montana parole statute providing that board "shall" release prisoner, subject to certain restrictions, creates dues process liberty interest in release on parole); *Greenholtz*, 442 U.S. at 11-12 (same). In such a case, a prisoner gains a legitimate expectation in parole that cannot be denied without adequate procedural due process protections. *See Allen*, 482 U.S. at 373-81; *Greenholtz*, 442 U.S. at 11-16.

California's parole scheme uses mandatory language and is largely parallel to the schemes found in *Allen* and *Greenholtz* to give rise to a protected liberty interest in release on parole:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore cannot be fixed at this meeting.

Cal. Penal Code § 3041(b). Accordingly, under the clearly-established framework of *Allen* and *Greenholtz*, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002). The scheme creates a

6

presumption that parole release will be granted unless the statutorily-defined determinations are made. *Id.* This is true regardless of whether a parole release date has ever been set for the inmate, because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003) (finding initial refusal to set parole date for prisoner with 15-to-life sentence implicated prisoner's liberty interest); *cf. McQuillion*, 306 F.3d at 903 (finding decision to rescind previously-granted parole release date implicated prisoner's liberty interest).

### 1. The Ninth Circuit Has Rejected Respondent's View That *Dannenberg* Found California Prisoners Have No Liberty Interest In Parole.

Respondent contends that the California Supreme Court determined a state prisoner does not have a federally-protected liberty interest in *In re Dannenberg*, 34 Cal. 4th 1061 (2005), and that Ninth Circuit decisions prior to *Dannenberg* finding that California prisoners have a liberty interest in parole must be re-evaluated. (Answer at 14.) This argument is unavailing in light of the Ninth's Circuit subsequent decision in *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), which was handed down after Respondent filed its Answer. *Sass* squarely held that "California inmates continue to have a liberty interest in parole after *In re Dannenberg*." *Id.* at 1125. *Sass* observed that *Dannenberg* merely addressed the narrow question of whether the Board must engage in a comparative proportionality analysis in setting parole dates before determining whether an inmate is suitable for parole. *See id.* at 1127-28. "*Dannenberg* does not explicitly or implicitly hold that there is no constitutionally protected liberty interest in parole." *Id.* at 1128. This Court is obligated to follow the Ninth Circuit's holding in *Sass* that California inmates have a liberty interest in parole.

### 2. The Supreme Court's "Atypical And Significant Hardship" Standard In *Sandin* Does Not Apply In The Parole Context.

In the alternative, Respondent argues that the Supreme Court's alternative methodology for determining whether a state creates a federally-protected liberty interest, set forth in *Sandin v. Conner*, 515 U.S. 472 (1995), "may apply" in the parole context. Respondent argues that, to the extent *Sandin* applies, California has not created a liberty interest in parole. (Answer at 14.)

7

The Ninth Circuit has interpreted *Sandin* as applying only to claims dealing with day-to-day prison management and not to parole eligibility, as is the case here. *McQuillion*, 206 F.3d at 902-03; *see also Biggs*, 334 F.3d at 914; *Sass*, 461 F.3d at 1127 n.3. While Respondent acknowledges this, Respondent urges this Court to reconsider whether *Sandin's* "atypical and significant hardship" standard might apply to the parole context in light of the Supreme Court's decision in *Wilkinson v. Austin*, 545 U.S. 209 (2005). In particular, Respondent argues that, in *Wilkinson*, the Supreme Court "explained that *Sandin* 'abrogated the methodology of parsing the language of particular regulations.'" (Answer at 15, quoting *Wilkinson*, 545 U.S. at 222.) The Court, however, finds no basis to depart from the Ninth Circuit's analysis because of *Wilkinson*. Reading *Wilkinson* in context, it is apparent that *Wilkinson*, like *Sandin*, focuses on prison disciplinary regulations, not parole eligibility.[1] *See Machado v. Kane*, 2006 WL449146 at *3 (N.D. Cal. Feb. 22, 2006) ("The applicability of *Greenholtz* and *Allen* to parole cases was not diminished by [*Wilkinson*] . . . It was applicable only to decisions about conditions of confinement, not to parole.").

Accordingly, because California prisoners have a constitutionally-protected liberty interest in release on parole, they cannot be denied a parole date (i.e., the parole board cannot decline to grant a parole date and cannot rescind an already-granted parole date) without adequate procedural protections necessary to satisfy due process.

**B.    The Board's Decision Complied With Federal Due Process Requirements.**

Calderon challenges the Board's most recent parole denial by alleging the Board violated of his due process rights when it denied his parole without any supporting evidence.

The Ninth Circuit has confirmed the use of the "some evidence" standard in the parole context. *See Sass*, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)); *Irons v. Carey*, 479 F.3d 658 (9th

---

[1] "*Sandin* involved prisoners' claims to procedural due process protection before placement in segregated confinement for 30 days, imposed as discipline for disruptive behavior. *Sandin* observed that some of our earlier cases, *Hewitt v. Helms,* [ ], in particular had employed a methodology for identifying state-created liberty interests that emphasized 'the language of a particular [prison] regulation' instead of 'the nature of the deprivation.' *Sandin*, 515 U.S. at 481, 115 S.Ct. 2293. In *Sandin*, we criticized this methodology as creating a disincentive for States to promulgate procedures for prison management, and as involving the federal courts in the day-to-day management of prisons. [ ]. For these reasons, we abrogated the methodology of parsing the language of particular regulations." *Wilkinson*, 545 U.S. at 222 (internal citations omitted).

8

1   Cir.2007).  The standard of "some evidence" is met if there was some evidence from which the

2   conclusion of the administrative tribunal could be deduced.  *See Hill*, 472 U.S. at 455.  An

3   examination of the entire record is not required nor is an independent assessment of the credibility of

4   witnesses or weighing of the evidence.  *Id.*  The relevant question is whether there is any evidence in

5   the record that could support the conclusion reached by the administrative board.  *See id.*

6   Additionally, the evidence underlying the Board's decision must have some indicia of reliability.

7   *See McQuillion*, 306 F.3d at 904.

8   When courts assess whether a state parole board's suitability determination is supported by

9   "some evidence" in a habeas case, the analysis is framed by state law.  California Code of

10  Regulations, title 15, section 2402(a) states that "[t]he panel shall first determine whether the life

11  prisoner is suitable for release on parole.  Regardless of the length of time serviced, a life prisoner

12  shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

13  an unreasonable risk of danger to society of released from prison."  The regulations direct the Board

14  to consider "all relevant, reliable information available," as well as "any other information which

15  bears on the prisoners suitability for release."  15 Cal. Code Regs. § 2402(b); *see also Martin v.*

16  *Marshall*, 431 F. Supp. 2d 1038, 1045 (N.D. Cal. 2006).  Further, the regulations list circumstances

17  tending to indicate whether or not an inmate is suitable for parole.  15 Cal. Code Regs. § 2402(c)-

18  (d).[2]  However, these circumstances are meant to serve as "general guidelines," giving the Board

19  latitude to weigh the importance of the combination of factors present in each case.  15 Cal. Code

20  Regs. § 2404(c).  Thus, the Board enjoys broad discretion in parole-related decisions.  *See In Re*

21  *Powell*, 45 Cal. 3d 894, 902 (1988).  The California Supreme Court has found that the foregoing

22  statutory scheme places individual suitability for parole above a prisoner's expectancy in early

23  setting of a fixed date designed to ensure term uniformity.  *See In re Dannenberg*, 34 Cal.4th at

---

[2] The circumstances tending to show an inmate's unsuitability are: (1) the commitment offense was committed in an "especially heinous, atrocious or cruel manner;" (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as "lengthy history of severe mental problems related to the offense;" and (6) prison misconduct.  15 Cal. Code Regs. § 2402(c). The circumstances tending to show an inmates suitability are: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress which built up over time; (5) Battered Woman's Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law.  15 Cal.Code Regs. § 2402(d).

9

1070-71. In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." *Id.* at 1071.

Here, the Board considered Calderon's commitment offense, pre-commitment criminal and social history, post-commitment disciplinary history, improvements and other evidence, including Calderon's own testimony. However, Calderon alleges the Board: (1) unnecessarily classified the commitment offense as "especially cruel and callous" (Petition at 11-14); (2) improperly considered his pre-commitment criminal and social history (Petition at 14); (3) failed to justify the weight placing Calderon's post-commitment disciplinary record over his gains (Petition at 15, 16); (4) failed to properly consider the psychological evidence before it (Petition at 15-16); and (5) failed to provide Calderon with adequate notice of his deficiencies (Petition at 16-17).

The Court addresses each of these allegations in turn.

**1.      The Commitment Offense.**

First, the Board considered Calderon's commitment offense. Calderon contends the Board improperly heightened the seriousness of his commitment offense by failing to compare his commitment offense with other kidnappings in determining the severity of the crime. However, Calderon's Petition and Traverse fail to offer any legal support for his allegation that the Board was required to make a comparative analysis of his commitment crime with other, similar crimes.[3]

Under California law, while the Board must consider all relevant, reliable information made available to it, the Board may, but is not required to, consider a non-exhaustive enumerated list of factors that tend to indicate whether or not the petitioner is suitable for parole. 15 Cal. Code Regs. § 2402. Additionally, circumstances that tend to indicate unsuitability include whether multiple victims were attacked, and whether the offense was done in a manner demonstrating "exceptionally callous disregard for human suffering." 15 Cal. Code Regs. § 2402.[4]  "The importance attached to

---

[3] Petitioner's argument cannot be grounded in any requirement imposed by California state law. The California Supreme Court has found that the statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. *See In re Dannenberg*, 34 Cal.4th 1061, 1070-71 (2005).

[4] Factors that indicate the commitment offense was committed in an especially heinous, atrocious or cruel manner include: (1) multiple victims were attacked, injured or killed in the same or separate incidents; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) the victim was abused, defiled or

10

any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." *Id.*

After reviewing the factual record of the commitment offense, the Board concluded the offense was "especially cruel and callous" because "[m]ultiple victims were attacked and held hostage during the crime. The offense was carried out in a manner which demonstrates a callous disregard for human suffering." (Resp., Ex. 2 at 75:15-20.) The record more than adequately supported the Board's conclusion. The crime had multiple victims, including an eight-year old child. It was undisputed by Petitioner at the parole hearing that both victims were left severely emotionally traumatized by the kidnapping, which included being captive in their own home at gunpoint, being placed in a car trunk, and being abandoned in a mountain area. The adult victim was handcuffed both while placed in the trunk, and handcuffed to an apparently disabled car when abandoned. Contrary to Calderon's assertion, the record demonstrates that the Board had, at a minimum, some evidence to conclude the commitment offense was "particularly egregious."

The Court finds Calderon's assertion that he "must be given credit for being involved in a crime where nobody was physically harmed" (Traverse at 13:14-16) to be barely colorable. Given that the victims were locked in the hot car trunk and later abandoned in a mountain area, Petitioner's testimony regarding the crime at the parole hearing could have been reasonably interpreted by the Board to indicate that good fortune (mercifully cool weather, and the victims' ability to get the car unstuck from the mud) played more of a role in protecting them from physical harm as any conscious decisions by Petitioner or his accomplices. In any event, the Board was not required to find the crime was not committed in an especially heinous, atrocious or cruel manner merely because no one ended up physically injured.

**2.   Pre-commitment Criminal and Social History.**

The Board noted that Calderon's pre-commitment criminal and social history played a role in their determination, observing "the prisoner has an escalating pattern of criminal conduct and a history of tumultuous relationships with others" and that Calderon "has failed to profit from

---

mutilated during or after the offense; (4) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (5) the motive for the crime is inexplicable or very trivial in relation to the offense. 15 Cal. Code Regs. §§ 2402(c)(1)(A)-(D).

11

society's previous attempts to correct his criminality."[5] (Resp, Ex. 2 at 77:1-7.) Calderon does not contest that he has a prior criminal record, or that he had relationships with others that could be construed as tumultuous, and the Court holds that the Board's findings in this respect were clearly supported by at least "some evidence."

Nonetheless, Calderon contends that the Board's repeated reliance on such unchanging factors in four successive parole hearings constitutes a due process violation. (Petition at 14; Traverse at 17.) In *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003), the Ninth Circuit first recognized in dicta that a continued reliance on an unchanging factor such as the circumstances of the offense in denying parole "could", at some point, result in a due process violation. *See id.* at 916-17.[6] That dicta has subsequently been acknowledged by the Ninth Circuit as the apparent law of the circuit. *See Sass*, 461 F.3d at 1129; *Irons*, 505 F.3d at 853; *Hayward v. Marshall*, 512 F.3d 536, 545 (9th Cir. 2008). However, the due process issue problem identified in this Ninth Circuit line of cases is not implicated here, because the Board based its denial of parole not only on Calderon's pre-commitment history, but on several post-commitment factors supported by "some evidence", as discussed below.[7]

---

[5] Factors indicating unsuitability for parole include a previous record of violence and unstable social history. 15 Cal. Code Regs. §§ 2402(c)(2), (3).

[6] State law creates no federally-protected liberty interest in this regard. The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." *In re Dannenberg*, 34 Cal.4th 1061, 1071 (2005); *see also In re Rosenkrantz*, 29 Cal.4th 616 682-83 (2002) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

[7] There is some question as to whether the principle discussed in this line of Ninth Circuit cases – that relying solely on static factors to deny parole can violate due process in certain extreme cases – has been clearly established by holdings of the United States Supreme Court. "Clearly established federal law", for purposes of relief under AEDPA, only refers to the holdings, as opposed to dicta, of United States Supreme Court decisions. *See Williams*, 529 U.S. at 412. Petitioner has not cited, and the Court has not identified in its own research, any Supreme Court decisions which directly indicate that even repeated reliance upon unchanging pre-commitment factors by a state parole board in denying parole, derived from application of relevant provisions of state law (which itself does not bar repeated reliance on such factors), demonstrates a violation of due process or, indeed, prevents such factors from serving as "some evidence" that parole should again be denied. The Ninth Circuit also recently observed, in a post-*Irons* but pre-*Hayward* decision, that "[t]here is no 'clearly established federal law as determined by the Supreme Court of the United States' that limits the number of times a parole board may deny parole to a murderer based on the brutality and viciousness of the commitment offense." *Culverson v. Davison*, 237 Fed.Appx. 174, 175 (9th Cir. June 8, 2007). However, in the recent 2008 *Hayward* decision, the Ninth Circuit appeared to regard the governor's reliance upon pre-commitment factors, combined with other "extraordinary circumstances", to be an unreasonable application of the "some evidence" standard established by the Supreme Court in *Hill*. *See Hayward*, 512 F.3d

### 3. **Post-Commitment Disciplinary Record and Gains**.

Calderon argues the Board failed to explain why it discounted his positive gains in favor of his post-commitment disciplinary record. (Petition at 15.) The Board may consider Calderon's post-commitment disciplinary record and positive gains in making a suitability assessment. 15 Cal. Code Regs. §§ 2402(b), (c). However, as discussed above, the weight assigned to each circumstance or set of circumstances is within the discretion of the Board. *Id.* at (c), (d).

Here, the Board specifically noted Calderon "has 11 115's and basically all of them are very serious. One was even an escape." (Resp., Exh. 2 at 79:6-12.) As the Board explained:

> The Panel also finds that the prisoner's gains are recent and he must demonstrate an ability to maintain these gains over an extended period of time. His most recent 115 was five years ago. It was serious. He also has 11 115's and basically all of them are very serious. One was even an escape. Panel also feels that his gains are recent because today was the first time he addressed the commitment offense with the Panel.

(*Id.* at 79:6-14.) The Board went on to commend Calderon for his gains, but ultimately concluded that "the positive aspects of his behavior and programming do not outweigh the factors of unsuitability and the commitment offense." (*Id.* at 79:24-80:1.)[8]

Despite this, Calderon contends the Board "never makes any attempt to justify how these 115s support Petitioner is an unreasonable risk or danger to society if released, especially when the evidence before it was to the contrary. The psychological report clearly established that Petitioner was a suitable candidate for parole." (Petition at 15.) Calderon's argument is unavailing. The balancing and weighing of relevant factors by the Board is not subject to the Court's scrutiny. *See Powell v. Gomez*, 33 F.3d 39, 42 (9th Cir. 1994). On this record, it is clear the Board had more than enough evidence before it to conclude Calderon's post-commitment negative developments outweighed the positive.

### 4. **Psychological Evaluations.**

Calderon contends the Board discounted positive psychological reports in favor of an older,

---

at 548. In any event, the Court need not resolve today whether this line of Ninth Circuit cases espouses a principle clearly established by federal law, because even if it does, it does not aid Petitioner.

[8] Calderon's misconduct after entering prison included writing a letter to his cousin soliciting false testimony to minimize Calderon's role in the kidnapping. (Doc. #3, Ex. A at 61-62.) It is not clear from the record whether this was the subject of one of the 115s that Calderon received.

13

1 negative report. Respondent argues the Board properly considered Calderon's psychological reports
2 and dismissed those it deemed unreliable or inconsistent.

3 In making a suitability assessment, the Board may consider the petitioner's psychological
4 factors, including "past and present mental state," 15 Cal. Code Regs. § 2402(b); whether the
5 prisoner has a "lengthy history of severe mental problems related to the offense," 15 Cal. Code Regs.
6 § 2402(c)(5); and whether the prisoner indicates "understands the nature and magnitude of the
7 offense," 15 Cal. Code Regs. § 2402(d)(3).

8 Having reviewed the record, it is apparent the Board's assessment of Calderon's
9 psychological reports as contradictory and unreliable was not arbitrary, but instead was based on
10 reliable evidence. The Board considered a 1994 report by Dr. William Evans that stated Calderon's
11 violence potential was "less than average" (Resp., Exh. 2 at 46:20-24), and a 1997 report that found
12 Calderon less violent than the average inmate (*id.* at 46:25-27), although neither report gave "any
13 Axis I diagnosis." (*Id.* at 47:1.) The 1999 report by Dr. Steve Terrini stated that, "if released to the
14 community [Calderon's] violence potential is considered to be higher than the average citizen in the
15 community." (*Id.* at 47:2-6.) A one-page report by Dr. Joe Zika in 2002 stated Calderon was
16 examined by Dr. Terrini in 1999 and that an additional report was unnecessary. (*Id.* at 47:8-12.)
17 Another one-page report issued in 2004 stated that Calderon's risk factors "within the institutional
18 setting are average. The probability of recidivism and violence in the community no greater than
19 the average citizen." (*Id.* at 47:17-20.) Although that report concluded that Calderon was suitable
20 for release, the Board expressed concerns due to the lack of analysis and support for the reports
21 conclusion. (*Id.* at 47:24-48:4.) Additionally, the Board noted that the 2004 parole hearing was the
22 first time Calderon discussed the commitment offense. (*Id.* at 77-83.)

23 Having considered the record, it is apparent the Board's assessment of the reports was not a
24 "makeweight rationalization" designed to reach a "predetermined conclusion in search of
25 justification", as Calderon alleges. (Petition at 16.) The Board considered how much information
26 each report conveyed, as well as the timeline in which Calderon had expressed any insight into his
27 commitment offense. Noting that the recent psychological reports were unreliable and
28 contradictory, as well as Calderon's discussion of obtaining recent insight, the Board concluded that

14

Calderon was not suitable for parole because he needed additional time to demonstrate an ability to maintain his positive gains over a longer period of time. (Resp., Exh. 2 at 79:1–79:80:1.) This conclusion was supported by some evidence in the record.

### 5. The Board's Recommendations.

Calderon also alleges that the Board's recommendation that he continue to participate in self-help programs is "entirely unsupported" and has "every earmark of being 'a post hoc rationalization for a decision already made.'" (Petition at 16-17.) In denying parole, the Board stated "[t]he prisoner needs to participate in self-help to discuss, understand, and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others." (Doc. #3, Ex. A at 79:2-6.)

The petitioner's insight is a factor to be considered in making a suitability determination. 15 Cal. Code Regs. § 2402(d)(3). Here, there were several salient facts in the record suggesting that the petitioner could continue to make self-help progress beyond the level achieved. For the first time at the 2004 parole hearing, Calderon chose to discuss with the Board the commitment offense, and his insights regarding it. In that testimony, Calderon repeatedly referred to his insights on the crime in a manner suggesting that such insights were dynamically unfolding and recent. (Docket No. 3, Exh. A at 26:18-20, 42:6-14, 48:27-49:50:8.) Moreover, it had been only five years since Petitioner's string of serious disciplinary reports had stopped. The Court finds that the Board's conclusion regarding Calderon's need for further self-help progress was supported by some evidence.

### 6. The District Attorney's Opposition to Parole.

Calderon's Traverse raises one point not mentioned in his Petition: that the "blessing" of the prosecutor is not required for the Board to find the petitioner unsuitable for release. (Traverse at 21.) While Calderon is of course correct, the Court perceives no error in the Board's consideration of the prosecutor's opinion alongside other factors. In reviewing the entire record, it is evident that the District Attorney's opposition was not the sole deciding factor in the Board's decision.

///

///

///

**CONCLUSION**

For the foregoing reasons, Petitioner is not entitled to habeas relief on the grounds that the Board's denial of parole was a violation of his due process rights. Accordingly, the Court **DENIES** the petition for a writ of habeas corpus. A separate judgment shall issue, and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: March 21, 2008

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE